UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LOUISIANA FAIR HOUSING ACTION CENTER, INC.<br><br>Plaintiffs,<br><br>v.<br><br>GRUNDMANN ENTERPRISES, LLC, MARSHA GILBERT, AND THOMAS PETTINGILL,<br><br>Defendants. | CIVIL ACTION NO. 20-2331<br><br>JURY DEMANDED |

**COMPLAINT**

**PRELIMINARY STATEMENT**

1. This matter arises pursuant to the Fair Housing Act ("FHA") of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq*. Plaintiff Louisiana Fair Housing Action Center, Inc. ("LaFHAC"), is a nonprofit entity with a mission to eradicate housing discrimination in Louisiana. Defendants are the manager/owner and property manager of a 20-unit apartment building located in the French Quarter of New Orleans, Louisiana. LaFHAC undertook a testing investigation of Defendants' rental practices, which substantiated that Defendants engaged in a pattern of discriminating against African Americans. Defendants repeatedly misrepresented the availability of apartments and refused to negotiate with prospective African American tenants on the basis of their race. Plaintiff seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and attorneys' fees and costs to redress Defendants' unlawful discriminatory conduct.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 3613. This Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

3. Declaratory and injunctive relief is sought pursuant to 42 U.S.C. §§ 3613(c)(1), as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

4. Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiff's claim occurred there, and the property that is the subject of this suit is located there.

## PARTIES

5. Plaintiff LOUISIANA FAIR HOUSING ACTION CENTER, INC. ("LaFHAC") is a private, non-profit fair housing advocacy organization with a mission to eradicate housing discrimination in Louisiana.

6. LaFHAC seeks to promote equal housing opportunities in all housing transactions, including rentals. The organization advances its mission through a variety of activities, including education, outreach, counseling, investigation, advocacy, and enforcement.

7. LaFHAC engages in testing and other investigations of allegations of housing discrimination. Testing is a simulated housing transaction that evaluates a housing provider's treatment of individuals to determine if the provider is discriminating in violation of the FHA. LaFHAC employs "testers," who pose as prospective residents, renters, and homebuyers to obtain information about the conduct of housing providers for the purposes of investigating housing discrimination. Testing as an investigative tool has long been utilized by the United States

Department of Justice and fair housing organizations as an essential means to detect and confirm discriminatory practices that may go otherwise undetected.

8. LaFHAC is an "aggrieved person" as defined by the Fair Housing Act, 42 42 U.S.C. § 3602(i), and brings this Action on its own behalf.

9. At all times relevant to the complaint, Defendant GRUNDMANN ENTERPRISES, LLC owned the property located at 601 Iberville Street (also using the address of 201 Chartres Street) in New Orleans, Louisiana ("the Property").

10. The Property and the apartments within them are dwellings within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

11. Upon information and belief, at all times relevant to the complaint, Defendant THOMAS "TOMMY" PETTINGILL was employed as an onsite manager and rental agent for Grundmann Enterprises, LLC and the Property. At all times relevant to this complaint, Pettingill was and held himself out as a rental agent of the Property with the discretion to field rental inquires, show apartments, and select renters.

12. Upon information and belief, at all times relevant to the complaint, Defendant MARSHA GILBERT was employed as general manager for Grundmann Enterprises, LLC and the Property. At all times relevant to the complaint, Gilbert exercised authority over and supervised Thomas Pettingill in his site management and rental activities, including the conduct alleged below.

13. At all times relevant to the complaint, Defendants had knowledge that discriminating in leasing on the basis of race violates federal fair housing laws.

## FACTUAL ALLEGATIONS

### First Test

14. LAFHAC periodically audits the rental housing market to ensure that discriminatory practices are not occurring in the community. These investigations involve the testing of a sample of housing providers within a short period of time (as determined by availability of testers and number of properties advertising units for rent).

15. In December 2016, as a part of an audit that tested the rental practices of seventy-five housing providers in New Orleans, LaFHAC tested the Defendants' property at 601 Iberville Street.

16. The testers were instructed to pose as prospective renters responding to a Craigslist posting that advertised a vacancy at the Property. On December 16, 2016, within an hour of one another, both a white tester and an African American tester called and left a voicemail expressing interest in the apartment that Defendants had advertised on Craigslist.

17. The Defendants only called the white tester back.

### LaFHAC's Determination to Test Further

18. In LaFHAC's experience, a single test showing disparate treatment may be indicative of a discriminatory practice. Based on the differential treatment shown in the first test, and in furtherance of its mission to eradicate housing discrimination in Louisiana, LaFHAC diverted its resources from other planned activities to initiate a focused testing investigation of the Property to confirm Defendants' discriminatory rental practices.

### Second Test

19. In July 2017, LaFHAC's investigative staff became aware of a Craigslist advertisement for a one-bedroom apartment at the Property available to rent for $950 monthly rent.

20. On July 12, 2017, an African American tester called the number on the advertisement, and Defendant Pettingill answered the call. The tester inquired whether the one-

4

bedroom unit in the advertisement was still available, and Pettingill told her that it was not and that there were no one bedrooms currently available. Pettingill stated that a two-bedroom unit for $1,500 per month was available.

21. Pettingill and the tester made an appointment to see the two-bedroom unit the next day (July 13) and the tester viewed the unit with Pettingill.

22. During the tour, Pettingill volunteered that units at the Property sit on the market because "crime down here [near the building] is totally crazy."

23. Pettingill stated to the tester that there was a twenty dollar fee to apply for a unit.

24. That same day, a few hours after Pettingill had shown the two-bedroom unit to the African American tester, a white tester called regarding the advertisement and spoke to Pettingill.

25. The white tester asked if the advertised one bedroom for $950 was available. In contrast to what information was given to the African American tester, Pettingill said that the apartment was available. Pettingill also mentioned the available two-bedroom unit, but quoted its price as a hundred dollars less ($1,400) than as quoted to the African American tester. Pettingill and the white tester made an appointment to view the one bedroom the next day.

26. On the appointed day, July 14, Pettingill showed the white tester not only the one-bedroom unit for $950, but three additional one-bedroom units he stated were available for immediate leasing (ranging in price from $900 to $1000).

27. During the viewings, Pettingill told the white tester that the building was located on a "safe street."

28. Pettingill told the white tester that he would waive the twenty dollar application fee if she applied.

### Third Test

29. A few weeks later, LaFHAC coordinated another test.

30. On July 26, 2017, an African American tester spoke to Defendant Pettingill regarding a one-bedroom apartment advertised on Craigslist for $850. Pettingill told the tester that the one bedroom for $850 was not available, but two other one-bedroom units for $1,000 per month were available, as was a two-bedroom for $1,400.

31. Less than an hour after this call, a white tester called the number on the advertisement and spoke to Pettingill. The tester asked about the advertised one bedroom for $850, and Pettingill stated, in contrast to the information provided the African American tester, that the unit for $850 was still available.

32. Both testers made appointments to see the units discussed with Pettingill for the following day.

33. The African American tester had the first appointment; she was shown two units that were each quoted for $1,000 monthly rent.

34. Pettingill informed her of the application fee. He did not have a paper application to give her, but he promised to send one electronically. Despite a follow up text and a phone conversation after the appointment, Pettingill never forwarded an application.

35. The white tester's appointment began ten minutes after the African American's had concluded; the white tester was shown a one bedroom apartment that was not shown to the African American tester, and was quoted an $850 monthly rent ($150 less than was quoted to the African American tester).

36. Pettingill did not inform the white tester of any application fee. When she requested an application during the tour, Pettingill provided her a paper application that she could take with her.

**Fourth Test**

37. LaFHAC continued its investigation of Defendants' rental practices in the summer of 2018.

38. A test in June was inconclusive because neither the white nor African American tester's calls were returned.

**Fifth Test**

39. On the morning of August 22, 2018, an African American tester and a white tester each called the number provided on an advertisement for a one-bedroom unit and left voicemails expressing interest. The African American tester called first, and the testers' calls were about an hour apart.

40. In the voicemail she left, the African American tester identified herself as Ebony, expressed the desire for an appointment to see the advertised unit, and requested a call back.

41. The white tester said her name was Claire, expressed an interest in seeing the unit, and requested a call back.

42. Pettingill called the white tester back later that morning, and they arranged to view the unit the next day.

43. Pettingill never contacted the African American tester.

**Sixth Test**

44. LaFHAC undertook a further round of tests in 2019.

45. On June 3, 2019, an African American tester and a white tester each called the number provided on an advertisement for a one-bedroom unit and left voicemails expressing interest. The African American tester called first, and the testers' calls were about two hours apart.

46. Pettingill called the white tester back the following day, but she did not pick up the call. He then texted her and let her know that her voicemail was full and he was unable to leave a message. She called him back and they arranged to view the unit the next day.

47. During the tour of the apartment, Pettingill commented to the white tester, in reference to the property's tenants: "All the people are cool. I'm selective who I let move in. Even the black people are really nice. Sweet people…. The ones I let move in."

48. Pettingill never responded to the African American tester.

### Seventh Test

49. On June 18, 2019, an African American tester and white tester each spoke with Pettingill about a one-bedroom apartment advertised for $950 on Craigslist. Both testers arranged to view the unit the following day.

50. The African American tester toured the apartment with Pettingill first. During the tour, the tester asked if there were any other apartments available other than the one he viewed. Pettingill said, "That's it."

51. The white tester toured the same apartment with Pettingill about one hour later. During the tour, Pettingill volunteered that there was another one bedroom and a two bedroom available in the building and he asked if the tester was interested in seeing them.

### Eighth Test

52. On October 2, 2019, an African American tester and a white tester each called the number provided on an advertisement for a one-bedroom unit and left voicemails expressing interest. The African American tester called first, and the testers' calls were about an hour apart.

53. In the voicemail she left for Pettingill, the African American tester identified herself as Iesha, stated that she would like to see the available apartment as soon as she could, and requested a call back.

54. The white tester said her name was Theresa, expressed an interest in seeing the available apartment, and requested a call back.

55. Pettingill called the white tester back later that day and made arrangements to show her the apartment that evening. The white tester toured the apartment as scheduled.

56. Pettingill never contacted the African American tester.

## Injury to LaFHAC

57. LaFHAC's efforts in furtherance of its mission have been directly harmed by Defendants' discrimination against individuals on the basis of race.

58. After the initial testing that occurred within an audit investigation of the area rental market, the focused investigation of the Property to identify and confirm the Defendants' discriminatory rental practices involved the commitment of significant time and resources.

59. Among other investigative actions, LaFHAC's Coordinator of Investigations and auxiliary staff monitored for advertisements, developed the testers' rental profiles, coordinated the tests, and analyzed and summarized the numerous calls and site visits. LaFHAC further expended funds to compensate the testers for the specific tests they undertook at the Property.

60. In order to undertake the testing investigation, LaFHAC diverted its investigative resources from other investigative projects and activities in furtherance of its mission. The diversion of resources occasioned by the Defendants' discriminatory conduct impaired or impeded these projects and activities.

61. LaFHAC also dedicated significant resources to counteracting the effects of Defendants' discrimination in the community. Such resource expenditure included LaFHAC's dedication of staff time and organizational funds to engage in education and outreach activities narrowly targeted to counteract the Defendants' specific discriminatory practices.

62. The education and outreach activities included the creation and distribution of materials addressing race-based discrimination and working with community partners to best reach the communities affected by the discrimination.

63. For example, LaFHAC worked with Stand with Dignity (a non-profit organization) to conduct outreach among hospitality and service workers whose workplaces concentrated in the French Quarter. New Orleans' hospitality and service workers are disproportionately people of color and thus especially harmed by race-based discrimination occurring in a 20-unit building offering accessible rents and located in the French Quarter.

64. As a result of these counteraction efforts, which are ongoing and made specifically in response to Defendants' conduct as alleged herein, LaFHAC has diverted its resources away from other planned projects and activities in furtherance of its mission. Those planned projects and activities included LaFHAC's annual fair housing conference, development of general fair housing outreach materials, and other projects and activities. The diversion of resources occasioned by the Defendants' discriminatory conduct impaired or impeded these projects and activities.

## **CLAIMS**

## **COUNT I**

### **Fair Housing Act, 42 U.S.C. § 3604**

(All Defendants)

65. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

66. In carrying out the actions alleged in Paragraphs 15-56, Defendant Thomas Pettingill acted with the consent of, under the control of, and/or within his actual and/or apparent authority as an agent of Defendants Grundmann Enterprises, LLC and Marsha Gilbert.

67. By the conduct set forth above, Defendants

   a. discriminated in the rental of a dwelling, refused to negotiate for the rental of a dwelling, or otherwise made a dwelling unavailable because of race, in violation of 42 U.S.C. § 3604(a) and 24 C.F.R. § 100.60 and 100.70.

   b. discriminated in the terms, conditions or privileges of the rental of a dwelling because of race, in violation of 42 U.S.C. § 3604(b) and 24 C.F.R. § 100.65;

   c. made or caused to be made a statement with respect to the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on race in violation of 42 U.S.C. § 3604(c) and 24 C.F.R. § 100.75; and

   d. represented to a person because of race that a dwelling was not available for inspection, sale, or rental when such dwelling was in fact so available, in violation of 42 U.S.C. § 3604(d) and 24 C.F.R. § 100.80.

68. With respect to the conduct alleged above, Defendant Thomas Pettingill acted with willful disregard, malice, or reckless indifference that his actions violated the Fair Housing Act.

69. With respect to the conduct alleged above, Defendant Grundmann Enterprises, LLC acted with willful disregard, malice, or reckless indifference that its agent violated the Fair Housing Act.

70. With respect to the conduct alleged above, Defendant Marsha Gilbert acted with willful disregard, malice, or reckless indifference that her agent violated the Fair Housing Act.

71. Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

72. Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA, 42 U.S.C. § 3613(c).

## COUNT II

## NEGLIGENT SUPERVISION AND TRAINING UNDER LOUISIANA LAW

(Defendant Grundmann Enterprises, LLC)

73. Under Louisiana law, Defendant Grundmann Enterprises, LLC had a duty to avoid causing injury and harm through negligent supervision and training of its agents and employees.

74. Under Louisiana law, Defendants Grundmann Enterprises, LLC was negligent in the supervision and training of its employees and/or agents Defendants Pettingill and Gilbert insofar as the supervision and training lapses provided Pettingill and Gilbert with an opportunity to violate federal anti-discrimination laws. These lapses were the proximate cause of foreseeable injury to Plaintiff.

75. Upon information and belief, Defendant Grundmann Enterprises, LLC provided Pettingill and Gilbert with no training or inadequate training related to the obligations not to discriminate in violation of applicable civil rights laws.

76. By and through the actions of its employees/agents Pettingill and Gilbert, Defendants Grundmann Enterprises, LLC breached its duty to LaFHAC.

77. But for the actions of Defendant Grundmann Enterprises, LLC and its employees/agents Pettingill and Gilbert, LaFHAC would not have suffered the injuries and damages that are at issue in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court award the following relief:

A. Enter a declaratory judgment that the discriminatory conduct of Defendants set forth above violated the Fair Housing Act;

B. Enter an injunction against Defendants, their agents, employees, successors, and all other persons in active concert or participation with them that:

    a. enjoins them from discriminating on the basis of race in violation of the Fair Housing Act;

    b. requires them to take affirmative steps to prevent the recurrence of discriminatory conduct in the future, including training, implementation of non-discrimination policies and procedures, reporting requirements, and any other steps that may be necessary;

C. Award Plaintiff compensatory damages;

D. Award Plaintiff punitive damages that would punish Defendants for the willful, malicious, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

E. Award Plaintiff its reasonable attorneys' fees and costs incurred in this action; and

F. Award any additional relief that is just and proper.

Dated: August 21, 2020

                                                            Respectfully Submitted,

*/s/ Peter F. Theis*
Peter Franklin Theis (La. Bar No. 34786)
LOUISIANA FAIR HOUSING
ACTION CENTER, INC.
1340 Poydras Street, Suite 710
New Orleans, LA  70112
Tel: (504) 208-5070
Email: ptheis@lafairhousing.org

*/s/ Elizabeth J. Owen*
Elizabeth Joanne Owen (La. Bar No. 33620)
LOUISIANA FAIR HOUSING
ACTION CENTER, INC.
1340 Poydras Street, Suite 710
New Orleans, LA  70112
Tel: (504) 708-5291
Email: eowen@lafairhousing.org

*Counsel for Plaintiff*